# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| ELECTRICITY MAINE, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:13-cv-00380-NT |
| | ) |
| FREEDOM LOGISTICS, LLC d/b/a | ) |
| FREEDOM ENERGY LOGISTICS, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON MOTION TO VACATE ARBITRATION AWARD

This case comes before the Court on Plaintiff Electricity Maine, LLC's ("**Electricity Maine**") motion to vacate an arbitration award disposing of its contract dispute with Defendant Freedom Logistics, LLC d/b/a Freedom Energy Logistics ("**Freedom Logistics**") and remand the question of damages to a new arbitrator. (ECF No. 1). For the reasons that follow, the Court **DENIES** the Plaintiff's motion.

## I.     Background

Electricity Maine sells electricity to homes and small businesses. Freedom Logistics supplies electricity to commercial and industrial companies and provides energy-related consulting services. In July of 2011, Freedom Logistics and Electricity Maine entered into an Energy Management Services Agreement. Attach. 1 to Pl.'s Appl. to Vacate Arb. Award (the "**Agreement**") (ECF No. 1-1). Under the Agreement, Freedom Logistics would act as Electricity Maine's agent and representative in connection with Electricity Maine's intended licensure by the Maine Public Utilities

Commission.[1] In exchange for Freedom Logistics' services, Electricity Maine agreed to pay Freedom Logistics a monthly fee based in part on Electricity Maine's power supply outputs, but in no event more than $25,000 per month.

The parties initially drafted the Agreement to last for a term of one year, terminable by either party at any time, for any reason, upon thirty days' notice. Agreement ¶¶ 2, 3(A). However, the parties amended the initial draft to instead run for a term of three years. Agreement Amendment 12. The text of the amendment explained that Freedom Logistics sought the term change because while "[Freedom Logistics] is completely prepared to put its time and resources into working closely with Electricity Maine to build its residential supply effort," it required "formal assurance that the relationship will not be ended prematurely." Agreement Amendment 12. The parties also amended the Agreement's termination provision, so that the three-year term could only be cut short due to: (1) the health, death or serious illness of principals; (2) unexpected financial downturn; (3) Electricity Maine's discontinuance of operations; or (4) adverse changes in business climate. Agreement Amendment 12.

Less than a year into the Agreement's three-year term, Electricity Maine sent Freedom Logistics a notice of termination, citing a potential unexpected financial downturn, an adverse change in business climate, and additional reasons not enumerated in the Agreement's termination provision (breach of contract, bad faith).

---

[1] The state legislature tasked the Maine Public Utilities Commission with licensing electricity providers following the state's transition to a deregulated electricity market in 2000. *See* 35-A M.R.S.A. § 3203.

Attach. 2 to Pl.'s Appl. to Vacate Arb. Award (ECF No. 1-2). In response, Freedom Logistics submitted a demand for arbitration in June of 2012, citing its rights under § 13 of the Agreement.[2] Attach. 3 to Pl.'s Appl. to Vacate Arb. Award (ECF No. 1-3).

The parties selected retired Maine Law Court Justice Paul L. Rudman to conduct the arbitration. Following some initial discovery, Justice Rudman issued a scheduling order, which stated in part:

> The issues are bifurcated. In the first phase the Arbitrator will consider:
> a. Whether the termination by [Electricity Maine] of its contract with [Freedom Logistics] was authorized by the agreement or otherwise, and
> b. The amount of money owed by [Electricity Maine] to [Freedom Logistics] as of the date of the contract's termination.
>
> In the second phase, to be scheduled at a time mutually agreeable to the parties, the Arbitrator will determine the amount, if any, due to [Freedom Logistics] as a result of [Electricity Maine's] termination of the Contract.

Attach. 8 to Pl.'s Appl. to Vacate Arb. Award (ECF No. 1-8).[3]

Following the "phase one" hearing, Justice Rudman found in favor of Freedom Logistics and determined that Electricity Maine's "attempted cancellation of the . . .

---

[2]  Section 13 of the Agreement reads in part:

> all disputes, claims or controversies arising under or related to this Agreement, including, but not limited to . . . any breach or termination hereof, shall be escalated to senior management of [Freedom Logistics] and Customer [Electricity Maine] as applicable, and any such dispute, claim or controversy remaining unresolved following any such senior management discussions shall be revolved [*sic*] exclusively through binding arbitration . . . . Arbitration awards shall be binding and conclusive upon the Parties . . . and the relevant Parties shall comply fully with such awards in good faith. At the conclusion of the arbitration proceedings, the arbitrator shall make an award of reasonable attorneys' fees and costs to the Party which prevailed in the arbitration, if such Party can be readily determined.

Agreement § 13.

[3]  The Court has corrected certain minor typographical errors.

3

Agreement . . . was without justification either by the explicit language of the contract or by any material breach of the contract by [Freedom Logistics]." Attach. 10 to Pl.'s Appl. to Vacate Arb. Award ¶ 1 (ECF No. 1-10). The arbitrator further stated that

> [Freedom Logistics] is therefore entitled to damages and suggests that the proper measure of its damages is set forth in Section 236(1) RESTATEMENT (SECOND) CONTRACTS.[4] To the extent [Electricity Maine] asserts a different formula applies, [Electricity Maine] shall provide the Arbitrator with a memorandum of law setting forth that formula . . . .

Attach. 10 to Pl.'s Appl. to Vacate Arb. Award ¶ 2.

Both parties submitted this damages-related briefing, and Freedom Logistics included an affidavit from its Vice President of Business Operations with its brief establishing actual damages amounts if the arbitrator concluded that § 236(1) of the Restatement applied.[5] Attach. 11 to Pl.'s Appl. to Vacate Arb. Award ("**Electricity Maine's Damages Memo**") (ECF No. 1-11); Attach. 2 to Pl.'s Reply ("**Freedom Logistics' Damages Memo**") (ECF No. 11-2); Ex. A to Freedom Logistics' Damages Memo. Shortly thereafter, the arbitrator emailed the parties regarding "whether [Electricity Maine] disputes the calculations" in Freedom Logistics' affidavit. Attach.

---

[4] "A claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance." Restatement (Second) Contracts § 236(1).

[5] Freedom Logistics also included the following in an earlier post-hearing memo:

> although this arbitration has been bifurcated into a Phase 1, in which liability for damages up to the date of the termination of the Agreement are at issue, and a Phase 2, in which [Electricity Maine] evidently intends to argue that [Freedom Logistics] has mitigated its post-termination damages, [Freedom Logistics] continues to maintain that there is no cause to hold a separate evidentiary hearing addressing [Electricity Maine's] mitigation of damages argument.

Attach. 3 to Def.'s Opp'n to Pl.'s Appl. to Vacate Arb. Award 9 n.3 (ECF No. 18-3).

4

1 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award (ECF No. 2-1). Electricity Maine did not dispute Freedom Logistics' pre-termination damage amounts and agreed that the contract called for monthly payments of $25,000. Electricity Maine did, however, take issue with Freedom Logistics' calculation of post-termination damages, late fees, and interest. Attach. 2 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award (ECF No. 2-2). Electricity Maine also continued to press the legal arguments advanced in its previous briefing, calling for additional discovery and an evidentiary hearing. Attach. 2 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award.

Following these damages-related exchanges, the arbitrator adopted Freedom Logistics' theory of damages and entered an award in its favor. Attach. 6 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award (ECF No. 2-6). Electricity Maine later filed an unopposed motion to modify the award based on a mathematical error, and the arbitrator issued a modified award. Attach. 8 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award (ECF No. 2-8).

Freedom Logistics subsequently filed a motion to confirm the modified award in Cumberland County Superior Court ("**Superior Court**") on August 23, 2013. *Freedom Logistics, LLC v. Electricity Maine, LLC*, No. cv-13-375, (Me. Super. Ct., Cum. Cty, Aug. 23, 2013) (ECF No. 7-9). On October 15, 2013, Electricity Maine filed the present motion in federal court to vacate the arbitration award. Pl.'s Appl. to Vacate Arb. Award (ECF No. 1). That same day, Electricity Maine also filed a motion requesting that the Superior Court dismiss or stay its confirmation proceedings in

5

favor of Electricity Maine's newly-filed federal action. *Freedom Logistics, LLC v. Electricity Maine, LLC*, No. cv-13-375, (Me. Super. Ct., Cum. Cty, Oct. 15, 2013) (ECF No. 7-12). Freedom Logistics filed a motion to dismiss the federal court action on November 25, 2013, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Def.'s Mot. to Dismiss (ECF No. 7). The Superior Court granted Electricity Maine's motion to stay the state court action by order docketed on January 6, 2014. *Freedom Logistics, LLC v. Electricity Maine, LLC*, No. cv-13-375, (Me. Super. Ct., Cum. Cty, Jan. 6, 2014) (ECF No. 13). Magistrate Judge Rich issued a recommendation to deny Freedom Logistics' motion to dismiss Electricity Maine's federal court action on March 30, 2014, Recommended Decision on Def.'s Mot. to Dismiss (ECF No. 17), which this Court affirmed on June 10, 2014. Order Affirming Recommended Decision (ECF No. 22).

## II. Standard of Review

Under § 10 of the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 1-16 (2006), a court may only vacate an arbitration award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[6] Under this statute, a federal district court's review of an arbitration award is "extremely narrow and exceedingly deferential." *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir. 2000) (quoting *Wheelabrator Envirotech Operating Servs. Inc. v. Mass. Laborers Dist. Council Local 1144*, 88 F.3d 40, 43 (1st Cir. 1996)). As the First Circuit has explained:

> Indeed, "[a]rbitral awards are nearly impervious to judicial oversight." *Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 61 (1st Cir. 2000). A court's review of an arbitration award is highly deferential because the parties "have contracted to have disputes settled by an arbitrator" and thus, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). While the arbitrator's award must "draw its essence from the contract," as long as the arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* at 38.
>
> . . . To determine whether an arbitrator has exceeded his authority under § 10 . . . courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts," *id.*, and "[e]ven where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 8 (1st Cir. 1990).

*Id.*

In the past, the First Circuit has recognized an additional, non-statutory, ground for vacating arbitration awards that are in "manifest disregard of the law." *McCarthy v. Citigroup Global Mkts. Inc.*, 463 F.3d 87, 91 (1st Cir. 2006) (quoting

---

[6] Electricity Maine has also moved to vacate the arbitration award under the Maine Uniform Arbitration Act ("**MUAA**"), 14 M.R.S.A. §§ 5927-5949. Freedom Logistics notes that 14 M.R.S.A. § 5938(1)(D) is substantively identical to 9 U.S.C.A. § 10(a)(3), and that Electricity Maine has not argued that the MUAA warrants vacatur on any distinct grounds from those articulated in the FAA. Def's Opp'n 14 n.4. (ECF No. 18). The parties' briefs accordingly focused on interpretation under the FAA and the Court will do the same.

7

*Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.*, 274 F.3d 34, 35 (1st Cir. 2001)). The First Circuit has explained this "very limited" ground for vacatur:

> To establish such an exception, the challenger must show that the arbitration award complained of is: (1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact. *McCarthy v. Citigroup Global Mkts., Inc.*, 463 F.3d 87, 91 (1st Cir. 2006). To succeed, there must be "some showing in the record, other than the result obtained, that the arbitrator[ ] knew the law and expressly disregarded it." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 9 (1st Cir. 1990) (quoting *O.R. Secs., Inc. v. Prof'l Planning Assoc., Inc.*, 857 F.2d 742, 747 (11th Cir. 1988)).

*Ramos-Santiago v. United Parcel Serv.*, 524 F.3d 120, 124 (1st Cir. 2008).

The availability of this common law ground for vacatur was called into question in *Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Since that decision, the Supreme Court has not clarified whether the manifest disregard standard remains viable. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) ("We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc. . . .*"); *see also Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 695 F.3d 181, 187 (1st Cir. 2012) (assuming, without deciding, that the manifest disregard standard remains viable). As described below, the Court need not determine whether the "manifest disregard" standard survives, because there was no manifest disregard of the law in this case.

### III. Discussion

Electricity Maine makes the following arguments in support of its motion to vacate the arbitration award: (1) the arbitrator displayed a manifest disregard for the law in rendering a damage award; and (2) the arbitrator committed "misconduct" as

8

contemplated by § 10(a)(3) of the FAA in denying Electricity Maine the opportunity to obtain discovery and present evidence related to Freedom Logistics' actual damages and mitigation opportunities.

Freedom Logistics responds to these arguments as follows: (1) the First Circuit no longer recognizes "manifest disregard" as a ground for vacatur, and even if it did, the arbitrator made the correct legal determination that no evidentiary hearing was necessary to determine a damage award; (2) the arbitrator did not promise discovery or an evidentiary hearing regarding Freedom Logistics' actual damages and mitigation opportunities; (3) Electricity Maine did, in fact, have the opportunity to present relevant damages evidence; and (4) vacatur is inappropriate where, as here, any exclusion of evidence did not deprive Electricity Maine of a fair hearing.

### A. Manifest Disregard of the Law

Even assuming, without deciding, that the manifest disregard standard remains a viable ground for vacatur in this Circuit, reviewing courts may not overturn arbitration awards based on their mere disagreement with an arbitrator's legal decision. *See McCarthy*, 463 F.3d at 95 ("At most, after a merits analysis of the Modified Award, the district court arguably found a legal error in its result. However, our precedents forbid a district court from conducting such a review of an arbitration award."). Instead, to find manifest disregard, the arbitrator's decision must be "based on reasoning so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling." *Id.* at 91 (internal citations omitted).

Electricity Maine contends that the arbitrator should have reduced Freedom Logistics' damage award by: (1) any expenses Freedom Logistics saved by not having

9

to perform after Electricity Maine's contract breach; and (2) any failure to mitigate its damages. In other words, instead of awarding Freedom Logistics the full amount due under the Agreement, the arbitrator should have instead awarded Freedom Logistics its expected net profits, consistent with Restatement (Second) Contracts § 347 cmt. e ("The injured party is limited to damages based on his actual loss caused by the breach."). Freedom Logistics counters that where one party is in "total breach" of a contract, the non-breaching party is entitled to the entirety of the amount it was owed under that contract, as described in the Restatement (Second) Contracts § 236(1) ("A claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance."). Freedom Logistics further argues that Electricity Maine did not make certain damages-related "set-off" arguments to the arbitrator, despite multiple opportunities to do so. Additionally, Freedom Logistics contends that it is a consulting business with the capacity to service many clients, so pursuant to a "lost volume" seller theory,[7] it had no duty to mitigate damages.

Here, the parties briefed their differing theories of damages for the arbitrator several times, including after the arbitrator delivered his finding. *See, e.g.* Electricity

---

[7] Regarding the "lost volume" concept, the Restatement (Second) Contracts explains:

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

Restatement (Second) Contracts § 347 cmt. f.

10

Maine's Damages Memo; Freedom Logistics' Damages Memo. The fact that the arbitrator agreed with Freedom Logistics' legal theory that Electricity Maine owed Freedom Logistics the full amount due under the remaining term of the contract does not display "manifest disregard of the law." *See Advest, Inc.*, 914 F.2d at 10 (affirming denial of vacatur where arbitrator declined to apply the unsuccessful party's theory of damages, even where the prevailing party presented "no cohesive alternative"); *see generally United Paperworkers Int'l. Union,* 484 U.S. at 38 ("Where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect.").

### B. FAA § 10(a)(3) "Misconduct"

In the First Circuit, vacatur is inappropriate where the exclusion of evidence did not deprive the party of a fair hearing. *See Doral Fin. Corp. v. Garcia-Velez*, 725 F.3d 27, 31-32 (1st Cir. 2013); *Hoteles Condado Beach, La Concha and Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985). The "fair hearing" requirement has its basis in due process concerns, and accordingly requires notice and an opportunity to present relevant evidence and arguments. *Hoteles Condado*, 763 F.2d at 32.

In *Hoteles Condado,* an arbitrator awarded compensation and reinstatement to a former hotel employee who was dismissed for allegedly indecently exposing himself to a hotel guest. *Id.* at 36. The only eyewitness to the incident was the guest herself, but she refused to testify at the arbitration once the arbitrator made her husband sit outside of the hearing room during her testimony. *Id.* at 39. In the place of live testimony, the arbitrator admitted the transcript of the related criminal

11

proceeding against the employee, which contained the guest's testimony about the incident. *Id.* at 37. The arbitrator thereafter refused to afford the testimony in the transcript any weight. *Id.* at 37. Given that "no other evidence was available to substantiate or to refute the Company's charges," the arbitrator's refusal to consider the transcript "effectively denied the Company an opportunity to present any evidence in the arbitration proceeding . . . ." *Id.* at 40. These facts constituted the type of "misconduct" contemplated in § 10(a)(3), and the First Circuit accordingly affirmed the district court's decision to vacate the arbitration award. *Id.* at 42.

In *Doral Financial*, an arbitrator awarded severance compensation to a terminated employee and found that the former employer failed to establish that the employee had breached the non-competition provision of his employment agreement. *Doral Fin.*, 725 F.3d at 30. The company repeatedly attempted to obtain discovery from the employee's new company through third-party subpoenas. *Id.* at 29-30. The arbitrator denied each of the company's requests, all submitted after the deadline set forth in the scheduling order, despite the company's claims that their requests were based on newly-discovered evidence and necessary to prove that the terminated employee had breached his non-competition covenants. *Id.* In deciding that the arbitrator's refusal to issue the subpoenas did not run afoul of § 10(a)(3), the First Circuit observed that the company had adequate notice of the arbitration schedule and multiple opportunities to argue why the subpoenas should issue despite the lapsed deadline. *Id.* at 32. The company was not entitled to relief where it "lost the

arbitration fairly and squarely, after the tribunal afforded it more than adequate process to present its side of the dispute." *Id.* at 33.

Here, Electricity Maine does present evidence that the structure of the arbitration may have been executed differently than initially contemplated (where any "phase two" was limited to briefing from the parties, rather than a second phase of discovery and an evidentiary hearing). However, Electricity Maine was given multiple opportunities to present its damages arguments: first, in its briefing with respect to Freedom Logistics' motion for a protective order; next, in the post-hearing briefing the arbitrator ordered with respect to damages calculations; and finally, in its email response to the arbitrator regarding whether Electricity Maine disputed Freedom Logistics' proffered damages calculations. Attach. 6 to Pl.'s Appl. to Vacate Arb. Award (ECF No. 1-6); Electricity Maine's Damages Memo; Attach. 2 to Pl.'s Add'l Attachs. to Pl.'s Appl. to Vacate Arb. Award.

This case is distinguishable from *Hoteles Condado*. There, the arbitrator committed "misconduct" where he refused to give any weight to the evidence available, and then found for the dismissed employee in light of the company's failure to submit sufficient evidence. Here, the arbitrator gave the parties the opportunity to present evidence and arguments, but did not afford Electricity Maine the chance to conduct additional discovery, presumably because he became convinced of a theory of damages that did not require further evidentiary development.[8]

---

[8] Electricity Maine cites two additional cases in support of its § 10(a)(3) argument, both of which are distinguishable from the matter at hand. In *Gulf Coast Industrial Workers Union v. Exxon Company, USA*, 70 F.3d 847, 849 (5th Cir. 1995), an arbitrator misled an employer into believing a drug test report had been admitted into evidence as a business record, but later refused to consider it

13

The better comparison is to *Doral Financial*. There, the arbitration tribunal did not commit "misconduct" where it denied a party the opportunity to seek discovery regarding one of its claims. Here, the arbitrator's arguably truncated "phase two" did not rise to the level of "misconduct" where his chosen theory of damages did not require further discovery. *See Keebler Co. v. Truck Drivers, Local 170*, 247 F.3d 8, 11 (1st Cir. 2001) ("[T]he arbitrator is free to set his own rules of procedure so long as he stays within the bounds of fundamental fairness."). Electricity Maine had a fair hearing on the merits, and it was not deprived of a fair hearing where it presented its damages arguments to the arbitrator but was not allowed to press on with discovery once doing so was irrelevant to the theory of damages accepted by the arbitrator.

---

on hearsay grounds. The arbitrator then decided in favor of the dismissed employee, finding that the company had not terminated the employee for "just cause" as required by his collective bargaining agreement. *Id.* at 849-50. In *Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F.Supp. 570, 574 (N.D.N.Y. 1982), a union was unable to complete its presentation of evidence where a hearing was cut short, either because the arbitrator resigned midway through the presentation of evidence, or because the union president engaged in a disruptive "tirade" against the arbitrator (the parties supplied affidavits telling "diametrically opposed versions of the same incident."). In the face of the unusual facts presented in each of these cases, vacatur was appropriate where the parties did not receive fair hearings in light of their truncated opportunities to present evidence. This case does not present comparable facts, where both parties had the opportunity to present evidence on the merits, but Electricity Maine wanted the opportunity to further develop the factual record for purposes of a damages award determination.

14

## CONCLUSION

For the reasons stated above, the Court **DENIES** Electricity Maine, LLC's motion to vacate the arbitration award and remand the question of damages to a new arbitrator.

SO ORDERED.

/s/ Nancy Torresen<br>United States District Judge

Dated this 22nd day of August, 2014.